UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| MICHAEL EVANS | * | CIVIL ACTION NO. 23-cv-4987 |
| | * | |
| VERSUS | * | JUDGE WENDY B. VITTER |
| | * | |
| MORAN TOWING CORPORATION | * | MAGISTRATE JUDGE EVA J. DOSSIER |

* * * * * * * * * * * * * * * * * * * * * * * *

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

MAY IT PLEASE THE COURT:

This is a personal injury lawsuit filed by Plaintiff Michael Evans (hereafter "Evans") against Defendant Moran Towing Company (hereafter "Moran Towing"). As stated in the Amended Complaint, Evans brings claims against Moran Towing for negligence pursuant to 33 U.S.C. sec. 905(b), the Longshoreman and Harbor Workers Compensation Act (the LHWCA).[1] However, because Moran Towing did not breach any of the three exclusive and narrow duties owed under 905(b), as set forth by the United States Supreme Court, Moran Towing is entitled to summary judgment as a matter of law.[2]

**FACTUAL BACKGROUND**

On July 24, 2022, the date of the alleged incident subject of this litigation, Plaintiff, Michael Evans (hereafter "Evans"), was employed by CLE Services as a day laborer.[3] CLE Services is a labor staffing company which supplies workers to other companies.[4] All assignments

---

[1] R.Doc. 26, para. 2
[2] Scindia Steam Nav. Co., Ltd. V. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981); *See Also* Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 114 S.Ct. 2057, 129 L.Ed.2d. 78 (1984).
[3] (R.Doc. 26, p. 7; Exhibit A (Deposition Michael Evans, April 15, 2024, page 40, lines 12-18).
[4] Exhibit A (Deposition Michael Evans, April 15, 2024, page 40, lines 16-22).

given to Evans by CLE Services were to work with Buck Kreihs Marine Repairs, LLC (hereafter "Buck Kreihs").[5] On jobs assigned to Buck Kreihs through CLE Services, Evans was supervised mainly by Sal Caserta ("Caserta") or Craig Johnson, both direct employees of Buck Kreihs.[6] Hereafter, references to Evans's employer or his co-workers will be to "Buck Kreihs."

On the day in question, Evans arrived at the Buck Kreihs facility shortly before the beginning his 4:30 pm to 4:30 a.m. shift.[7] He met with, *inter alia*, his supervisor Caserta and his co-workers Brad Dixon ("Dixon") and Megail McFarland ("McFarland").[8] Caserta assigned the three man crew to work aboard the M/V LEIGH ANN MORAN ("the vessel"), owned by Defendant Moran Towing.[9] Caserta testified that he usually assigned those men to work together because they were friends and that Evans needed experienced workers, such as Dixon, to work with because Evans often displayed a lack of judgment.[10] To wit, among other examples, Evans had previously suffered a serious hand injury because his hand was crushed by a hatch cover, and he suffered a laceration to his face from a grinder tool.[11] According to Caserta, Evans had a history of behaving improvidently on the job.[12]

Evans, Dixon, and McFarland were tasked with inspecting a valve in the ballast tank of the vessel.[13] Initially, Evans stayed on shore to gather tools while Dixon and McFarland boarded the

---

[5] Exhibit A (Deposition Michael Evans, April 15, 2024, page 48, lines 25, page 49, lines 1-2).
[6] Exhibit A (Deposition Michael Evans, April 15, 2024, page 45, lines 1-9, page 46, lines 3-8, page 47, lines 1-6, page 52, lines 17-25, page 53, lines 1-2).
[7] Exhibit A (Deposition of Michael Evans, April 15, 2024, page 43, line 25, page 44, line 1).
[8] Exhibit A (Deposition of Michael Evans, April 15, 2024, page 45, lines 1-5, page 52, lines 17-19, page 139, lines 6-25.
[9] Exhibit D (Deposition of Salvatore Caserta, III, July 30, 2024, page 11, lines 21-25, page 12, 1-6).
[10] Exhibit D (Deposition of Salvatore Caserta, III, July 30, 2024, page 10, lines 13-25, page 11, lines 1-5, 14-20).
[11] Exhibit D (Deposition of Salvatore Caserta, III, July 30, 2024, page 8, lines 23-25, page 9, lines 1-10, page 10, lines 2-12).
[12] Exhibit D (Deposition of Salvatore Caserta, III, July 30, 2024, pages 8-12).
[13] Exhibit A (Deposition Michael Evans, April 15, 2024, page 139, lines 10-25, page 140, lines 2-4 [*Evans refers to it as "two pieces of pipe" but other deponents testified it was a valve*]); Exhibit B (Deposition of Brad Dixon, June 25, 2024, page 10, lines 18-25); Exhibit E (Deposition of Charles Rogers, September 19, 2024, page 21, lines 13-14); Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 10, lines 14-20, page 11, lines 14-19).

vessel.[14]  Dixon testified that, once on board, he encountered a crew member and asked for a tool to open the cover for the ballast tank.[15]  He further stated that the same crew member showed him to the area of the vessel that was to be worked on and then the crew member departed the area.[16]  Dixon testified that the crew member said, "If you need something, let know" and Dixon responded "We [don't'] need nothing (*sic*) else."[17]  McFarland testified that a crew member (different from the person who provided the tool) showed them to the designated area who then left them to do their work.[18] As testified to by Evans and others, this comported with the usual method of going aboard a vessel to perform work. That is, the Buck Kreihs crew would make contact with someone on the vessel's crew to be shown the area of the vessel where they would be working and then the crew member would leave the Buck Kreihs crew to do their job.[19]

While Evans was not yet aboard, Dixon and McFarland proceeded to the forepeak area of the vessel.[20]  Dixon was in the hold inspecting the work area and McFarland was on the deck.[21]  Both Dixon and McFarland testified that the hatch between the deck and the hold was already open when they arrived.[22]  While the vessel's captain and chief engineer dispute this, as discussed *infra*, whether the hatch was already open is not dispositive of the issue subject of this motion because

---

[14] Exhibit A (Deposition of Michael Evans, April 15, 2024, page 143, lines 11-16, page 144, lines 14-20); Exhibit B (Deposition of Brad Dixon, June 25, 2025, page 12, lines 21-25, page 13, lines 1-7).
[15] Exhibit B (Deposition of Brad Dixon, June 25, 2025, page 13, lines 8-15, page 17, lines 6-9).
[16] Exhibit B (Deposition of Brad Dixon, June 25, 2024, page 13, lines 3-12, page 17, lines 1-5).  (The vessel's chief engineer, Charles Rogers testified that he supplied the tool to Evans but did not otherwise interact with Dixon or anyone else from the Buck Kreihs crew.  See Exhibit E (Deposition of Charles Rogers, September 19, 2024, page 32, lines 18-22, page 33, lines 6-13, page 34, lines 1-11, page 36, lines 3-6).
[17] Exhibit B (Deposition of Brad Dixon, June 25, 2024, page 17, lines 9-12).
[18] Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 13, lines 15-24, page 61, line 25, page 62, lines 1-3).
[19] Exhibit A (Deposition of Michael Evans, April 15, 2024, page 62, lines 8-22, page 158, lines 24-25, page 159, lines 1); Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 12, lines 19-21, page 13, lines 1-5).
[20] Exhibit A (Deposition of Michael Evans, April 15, 2024, page 144, lines 14-18, 24-25, page 145, lines 1-2)
[21] Exhibit B (Deposition of Brad Dixon, June 25, 2024, page 12, lines 21-25, page 13, lines 1-7).
[22] Exhibit B (Deposition of Brad Dixon, June 25, 2024, page 14, line 9-12, page 15, lines 1-3); Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 14, lines 10-15, page 25, lines 3-20)

Dixon and McFarland knew that the hatch was open (regardless of who initially opened it), knew it was unsecured, and continued to work.

At one point, Dixon was climbing up from the hold to the deck when the hatch cover began to close on him, possibly from vessel movement caused by the wake of a passing vessel.[23] Dixon and McFarland caught the cover and pushed it open.[24] However, somewhat incredulously, despite the fact that they had actual knowledge that the hatch cover was apparently not secured open and that the hatch with the potential to close suddenly would be used by the Buck Kreihs crew in their work, neither Dixon nor McFarland took any steps whatsoever to secure the hatch cover.[25] McFarland claims that he mentioned it to a crew member who happened to be passing by, but otherwise took no steps to secure the hatch cover.[26]

The hatch in question was an emergency escape hatch which was frequently maintained and kept in good working order by the vessel crew.[27] There is no evidence that the hatch itself, or the cover, was, in and of themselves, defective, Rather, the allegation is that there was no method available to secure the cover in an open position. This is demonstrably false. The hatch cover came equipped with a safety pin which secures the hatch cover in the open position.[28] Photographs of

---

[23] Exhibit B (Deposition of Brad Dixon, June 25, 2024, page 17, lines 13-21, page 18, lines 6-12, page 22, lines 23-24, page 23, lines 1-4, page 26, lines 21-23); Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 14, lines 21-25, page 15, line 1, page 20, lines 19-25, page 21, lines 2-7).

[24] Exhibit B (Deposition of Brad Dixon, June 25, 2024, page 17, lines 12-21, page 18, lines 6-9, page 19, lines 19-25, page 20, line 1, page 48, lines 1-6); Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 14, lines 21-25, page 20, lines 1-5).

[25] Exhibit B (Deposition of Brad Dixon, June 25, 2024, page 45, lines 23-25, page 46, lines 1-7, page 84, lines 6-23); Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 18, lines 18-20, page 67, lines 23-25, page 68, lines 4-14, page 71, lines 11-20).

[26] Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 15, lines 10-22, page 16, lines 3-7, page 21, lines 20-25, page 22, lines 1-2, 25, page 23, lines 1-2, 23-25, page 24, lines 1-3, page 36, lines 21-25, page 37, lines 1-2, page 60, lines 24-25, page 61, lines 1-2).

[27] Exhibit E (Deposition of Charles Rogers, September 19, 2024, page 107, lines 18-22, page 109, lines 11-14)

[28] Exhibit D (Deposition of Salvatore Caserta, III, July 30, 2024, page 20, lines 13-17); Exhibit E (Deposition of Charles Rogers, September 19, 2024, page 70, lines 11-14, 18-25, page 75, lines 8-25, page 76, lines 1-13).

the hatch cover taken immediately after the incident subject of this litigation by Buck Kreihs' supervisor Caserta clearly show that the safety pin was present and available for use.[29]

Moreover, Caserta, the Buck Kreihs supervisor, testified that the Buck Kreihs crew were trained to, and expected to, secure an open hatch cover.[30] McFarland admitted that there were options available to the Buck Kreihs crew, but they simply chose not to bother with any of them.[31]

Approximately 30 to 45 minutes after Dixon and McFarland boarded the vessel, Evans came aboard with an extension cord. Dixon and McFarland had still not secured the hatch cover at this point. Notably, there were no vessel crew members present.[32] Prior to dropping the cord into the hold, Evans got down on his hands and knees and stuck his head through the opening to call out to Dixon who was still in the hold. As admitted to by Evans, the hatch cover clearly constituted an obvious hazardous "pinch point."[33] Further, Evans admitted that he did not inspect the hatch cover to make sure it was secure.[34] The decision to position his head in the hatch opening without ensuring it was secured was solely Evans's.[35] While Evans was in this vulnerable position, apparently another vessel passed by and the hatch cover suddenly closed on Evans's head causing facial injuries including lacerations and broken bones.[36]

---

[29] Exhibit D (Deposition of Salvatore Caserta, III, July 30, 2024, page 20, lines 4-17. Page 64, lines 22-25, page 65, lines 1-7).

[30] Exhibit D (Deposition testimony of Salvore Caserta, III, July 30, 2024, page 90, lines 6-25, page 91, lines 1-2, page 94, lines 8-21).

[31] Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 74, lines 6-25, page 75, lines 1-6); Exhibit D (Deposition of Salvatore Caserta, III, July 30, 2024, page 90, lines 6-22).

[32] Exhibit A (Deposition Michael Evans, April 15, 2024, page 151, lines 18-20, page 155, lines 1-4).

[33] Exhibit A (Deposition Michael Evans, April 15, 2024, page 156, lines 3-25); See Also Exhibit F (Deposition of Jeffery Markert, June 25, 2024, page 37, lines 13-25, page 38, lines 1, 17-21); Exhibit D (Deposition of Salvatore Caserta, III, July 30, 2024, page 24, lines 14-25, page 25, lines 1-23, page 26, lines 1-3).

[34] Exhibit A (Deposition of Michael Evans, April 15, 2024, page 156, lines 13-24, page 157, lines 13-16).

[35] Exhibit A (Deposition Michael Evans, April 15, 2024, page 156, lines 22-25, page 157, lines 4-12).

[36] Exhibit A (Deposition Michael Evans, April 15, 2024, page 150, lines 20-22, page 161, lines 19-25, page 162, lines 1-2); Exhibit C (Deposition of Megail McFarland, June 27, 2024, page 64, lines 15-18, page 66, lines 18-19, page 82, lines 10-20, page 85, lines 13-14).

Subsequent to the incident, Evans brought claims against Moran Towing, as owner and/ or operator of the M/V LEIGH ANN MORAN, pursuant to 33 U.S.C. 905(b) of the Longshoreman and Harbor Workers Compensation. (R.Doc. 26, p. 2). However, because Moran Towing did not violate any of the three narrow duties owed to a maritime worker employed by an independent contractor under the Act as interpreted by the United States Supreme Court, Moran Towing is entitled to summary judgment as a matter of law.

## **LAW AND ARGUMENT**

Section 905(b) of the Longshore and Harbor Worker's Compensation Act grants covered maritime workers an exclusive remedy against a vessel and, *inter alia*, her owners for injuries caused by negligence of the vessel. In Scindia Steam Nav. Co, Ltd. v. De Los Santos, the United States Supreme Court defined the vessel's duties to longshoremen.[37] The reason for the narrowly defined vessel duties is the basic principle that the primary responsibility for the safety of covered workers rests upon the worker's employer. In essence, Scindia relieves the vessel owner of the automatic duty to inspect or supervise stevedoring operations.[38] Although Scindia refers to "longshoremen," the United States Court of Appeal for the Fifth Circuit extended the rationale of Scindia to any independent contractor (maritime employee) working aboard the vessel.[39] The three narrow duties owed by the vessel and/ or her owner to a covered maritime worker are (1) the turnover duty; (2) the active control duty; and (3) the duty to intervene.

---

[37] Kirksey v, Tonghai Mar., 535 F.3d 388, 391 (5th Cir. 2008) citing 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).
[38] Kirksey, 535 F.3d at 391 *citing* Greenwodd v. Scoiete Francaise de, 111 F.3d 1239, 1245 (5th Cir. 1997)
[39] Waas v. Taiheiyo Kisen Kaisha, Ltd., 2010 Lexis 35236 p. 12 (E.D. La. 04/07/2010) *citing* Casaceli v. Martech Int'l, 774 F.2d 1322, 1326-27 (5th Cir. 1985)

**The Turnover Duty**

Although not explicitly stated in the pleadings, the only duty with any faintly possible application to this case is the turnover duty. However, as discussed below, Moran Towing did not breach the turnover duty because the hatch cover was in proper working order and was equipped with a safety pin that could be used to secure the hatch cover in an open position.

The turnover duty applies to the vessel owner's obligation before, or at the commencement of, the maritime employer's activities.[40] This duty places two responsibilities on the vessel owner. First, the owner owes a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore/ maritime employer can carry on its operations with reasonable safety.[41] Second, the owner owes a duty to warn the stevedore/ maritime employer of latent or hidden defects which are known to the vessel owner or should have been known to it. However, the duty to warn of hidden dangers is narrow and does not include dangers which are (1) open and obvious or (2) dangers a reasonably competent stevedore/ employer should anticipate encountering.[42]

If the maritime worker knew of the defect, then it is considered open and obvious.[43] Further, if a defect is obvious to a fellow worker, even if it not obvious to the injured worker, the defect is considered apparent to a reasonably competent maritime employer.[44]

For the turnover duty to apply, the vessel owner <u>must</u> have actual knowledge of the defect or is imputed with knowledge "if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence."[45] The Fifth Circuit has stated

---

[40] Kirksey, 535 F.3d at 392.
[41] Kirksey, 535 F.3d at 392 [internal citations omitted].
[42] Id.
[43] Greenwood v. Societe Francaise De, 111 F.3d 1239, 1246 (5th Cir. 1997).
[44] Jackson v. Gearbulk, Inc., 761 F.Supp.2d 411, 420 (W.D. La. 2011) *citing* Greenwood, 111 F.3d at 1249 .
[45] Howlett, 512 U.S. at 100; Greenwod, 111F.3d at 1246.

that it is contradictory to hold a vessel owner accountable for discovering an apparent defect but to allow a maritime employer to miss the same defect with impunity.[46]

The United States Court of Appeals for the Eleventh Circuit recently considered the turnover over duty in the factually similar case of Purvis v. Maersk Line A/S.[47]  In Purvis, the plaintiff was injured when a hatch cover fell on his head when he was attempting to climb through it from below.  The hatch cover was already open and upright when Purvis first traversed through it.[48] The second time the plaintiff climbed the ladder to go through the hatch, the hatch cover unexpectedly "came crashing down on his head."[49]  The plaintiff posited that the hatch cover and latch must have been defective in some way and/ or a vessel crew member must have opened the hatch cover and failed to latch it.[50]  As to the first theory, the appellate court noted that there was no evidence of a defect that existed at the time of the incident.  As to the second theory, the appellate court stated that the argument failed because, even if a crew member had left the hatch in an open and upright position without being latched, the plaintiff could have remedied the issue after the first time he passed through it and would have been able to see the open hatch door.[51] Despite the fact that it was nighttime, the court held that the condition of an unlatched hatch cover would have been obvious to the plaintiff as a "reasonably competent" longshoreman and, as an "experienced longshoreman," he had the ability to remedy the condition.[52]  Thus, even if the hatch cover was not latched to prevent it falling, it should have been open and obvious to the plaintiff precluding a finding of a breach of the turnover duty.[53]

---

[46] Morris v. Compagnie Mar. Des chargeurs Reunis S.A., 832 F.2d 67, 69-70 (5th Cir. 1987).
[47]  795 Fed.Appx. 756 (11th Cir. 2024).
[48] Id at 758.
[49] Id.
[50]  Id. at 759
[51] Purvis, 795 Fed.Appx. at 759.
[52] Id at 760.
[53] Id.

The same rational applies in this case. Dixon and McFarland, Evans's fellow Buck Kreihs workers, had actual knowledge that the hatch cover was not secured in the open position. Moreover, it was day time thus the hatch cover and the attached safety pin were readily visible to Evans who, although apparently not terribly safety conscious, was nonetheless an experienced maritime worker. Among his other experience working on vessels, Evans had worked aboard several Moran Towing vessels prior and had even worked aboard the LEIGH ANN MORAN two or three times previously.[54]

In <u>Kirksey v. Tonghai Mar.</u>, the Fifth Circuit was called upon to decide whether a vessel owner had breached the subsidiary duty to warn and the defense that the stevedore knew of the vessel's condition (i.e. the condition was "open and obvious.").[55] In that case, the plaintiff was injured when a coil of steel tipped over in the cargo hold and fell on the plaintiff. However, prior to the cargo unloading operation, a marine surveyor hired by the stevedore found that the cargo stow was unstable.[56] Despite this, cargo unloading carried on, during which the condition of the stow was visible to the longshoremen. The appellate court reversed the district court on the issue of the turnover duty and the duty to warn on the basis that the stevedore, through its surveyor and the longshoremen actually on the job, was "well aware of the condition of the cargo stow." [57]

The <u>Kirksey</u> court also considered the impact of the "open and obvious" defense to the vessel owner's more general turnover duty to provide a safe vessel. The Fifth Circuit reviewed prior case law and held "[G]iven … the clear language strictly limiting the vessel's turnover duty to warn of latent defects and dangers, it makes no sense to say that the vessel is nevertheless liable

---

[54] (Deposition Michael Evans, April 15, 2024, page 60, lines 4-25).

[55] 535 F.3d 388 (5th Cir. 2008).
[56] <u>Id.</u> at 390.
[57] <u>Id</u> at 393.

9

to the longshoremen for the breach of the duty to turnover a safe ship based on an obvious defect against which it had no duty to warn."[58] In other words, if there is no duty to warn, the more general turnover duty cannot breached.

As stated above, Evans claims he was injured when an apparently unsecured open hatch cover fell on his head when he carelessly stuck his head into the open hatch to call down to his co-worker in the hold. Contrary to his assertions in the Amended Complaint, other than possibly being unlatched, there has been no evidence produced that the hatch cover was otherwise defective at the commencement of the Buck Kreihs crew's work. Just because the hatch cover happened to be open does not mean that it was defective.[59] No one has testified that the hatch cover was not in proper working order. In addition, the vessel's chief engineer, Charles Randall, testified that the hatches were routinely maintained. Crucially, photos taken by the Buck Kreihs supervisor immediately following the incident clearly show that the safety pin used to secure the hatch open was present, attached to the hatch cover, and available for use. The Buck Kreihs workers simply did not use it despite the fact that they were trained to do so. Testimony by Evans' co-workers, Dixon and McFarland, state that the hatch cover was open when they commenced their work, and they indisputably knew that the hatch was not secure because the cover began to close on Dixon at one point prior to Evans' accident. The condition of the hatch cover was open and obvious to Dixon and McFarland because they had actual knowledge of its propensity to close, and, thus, pursuant to Greenwood v. Societe, it was open and obvious to Buck Kreihs as the employer of

---

[58] Kirksey, 535 F.3d at 395.
[59] Purvis v. Ceres Marine Terminals, 2019 Lexis 72773 p. 20 (S.D. Ga 04/30/2019) aff'd Purvis v. Maersk Line, 795 Fed.Appx. 756 (11th Cir. 2024).

Evans.[60]   Therefore, there was no breach of the general turnover duty or the subsidiary duty to warn on behalf of Moran Towing.

**The Active Control Duty**

The active control duty is simply inapplicable here. Under the active control duty, a vessel may be liable under sec. 905(b) only if it "actively involves itself in the cargo operations and negligently injures" a maritime employee or if the vessel "fails to exercise due care to avoid exposing [the maritime employee] to harm from hazards [he] may encounter in areas, or from equipment, under the active control of the vessel" during the maritime employee's operations.[61] Liability under the active control duty is premised on the presence or existence of a "hazard" under the active control of the vessel.[62]  Unlike the turnover duty, liability under the active control duty is not relieved when the hazard is open and obvious.  Rather, if the vessel has relinquished control over an area to the maritime employer, then it is the primary responsibility of the employer to remedy a hazard in that area.[63]  The Fifth Circuit generally considers whether the area in question is within the contractor's work area, whether the work has been "turned over" to the maritime employer, and whether the vessel owner controls the methods and operative details of the maritime employer's work.[64]   The level of control required under the active control duty is "akin to 'operational control' at the time of the activities in question."[65]

---

[60] This Court has previously held that an unlatched hatch cover is not a hidden defect when the plaintiff could see that it was unlatched. Dupre v. Chevron, 1993 WL 99190 p. 3 (E.D. La. 03/31/1993).  The U.S. Fourth Circuit held that the fact that a hatch cover was unsecured by its normally-securing beam pin was an open and obvious condition. Anuszewski v. Dynamic Mariners Corp., 540 F.2d 757, 758-59 (4th Cir 1976).
[61] Scindia, 451 U.S. at 167.
[62] Patil v. Amber Lagon Shipping GmbH & Co., ___ Fed.Appx. ___, 2021 Lexis 26221 (5th Circ. 08/31/2024).
[63] Id. at 11.
[64] Dow v. Oldendorf Carriers GmbH & Co., 387 Fed.Appx. 504, 507 (5th Cir. 2010); Fontenot v. McCall's Boat Rentals, Inc., 227 Fed.Appx. 397, 403-404 (5th Cir. 2007)[internal citations omitted].
[65] Baham v. Nabors Drilling USA, 721 F.Supp.2d 499, 509 (W.D. La. 2010) aff'd 449 Fed.Appx. 334 (5th Cir. 2011).

Here, the vessel's crew had no involvement in the work of the Buck Kreihs crew in any way, shape, or form. They most certainly did not have "operational control." As testified to by Dixon and McFarland, and acknowledged as standard procedure by Evans, a crew member simply showed Dixon and McFarland the area of the vessel on which they would be working and then left them there. Other than a crew member possibly simply passing by after the hatch cover almost fell on Dixon, [66] there were no crew members present during their work, and Evans testified that there were no crew members present at the time of his accident. Having crew members in the vicinity of the work and/ or having maintenance responsibilities for the equipment do not create liability under this duty.[67]

**The Duty to Intervene**

Like the active control duty, the duty to intervene has no application under the facts of this case. The duty to intervene imposes liability on the vessel owner only "if the vessel owner fails to intervene in the [maritime employer's] operations when (1) [the vessel owner] has actual knowledge of both the hazards <u>and</u> (2) that the [maritime employer], in the exercise of 'obviously imprudent' judgment, means to work in the face of [the hazard] and therefore cannot be relied on to remedy [the situation]."[68] This is a narrow duty that requires something more than mere knowledge by the vessel owner of a dangerous condition.[69] The Eleventh Circuit has stated that "[o]nly the most egregious decisions by the [maritime employer] are 'obviously improvident.'"[70]

---

[66] Only McFarland testified to this. Dixon did not mention ever seeing a crewmember again after the initial encounter.
[67] <u>Manson Gulf, LLC v. Mod. Am. Recycling Serv., Inc.</u>, 878 F.3d 130, 135 (5th Cir. 2017)[the "mere presence" of vessel employees is not indicative of active control]; <u>Washington v. Nat'l Shipping Co.</u>, 374 F.Supp.#d 1139, 1358 (S.D. Ga. 2019).
[68] <u>Manson Gulf</u>, 878 F.3d at 134 [emphasis supplied].
[69] <u>Singleton v. Guangzhou Ocean Shipping Co.</u>, 79 F.3d 26, 28 (5th Cir. 1996).
[70] <u>Miller v. Navalmar (UK), Ltd.</u>, 685 Fed.Appx. 751, 757 (11th Cir. 2017).

In this case, Moran Towing could not intervene in Buck Kreihs' operations because no Moran Towing personnel were present or observed their work. Evans, Dixon, and McFarland all testified that there no crew members in the vicinity and that their only interaction with the crew was requesting a tool to open the ballast tank cover and being shown the area of their work. Even if one accepts the testimony of Dixon and McFarland that the hatch cover was already open when they arrived, it is manifestly clear that no crew member had any involvement with the hatch once the Buck Kreihs' work commenced.

Even if one can consider that Moran Towing had actual knowledge that the hatch was not pinned open or otherwise secured because McFarland may have possibly mentioned it to a passing crew member (which is denied), liability under the active control duty does **not** impose liability **unless** it can be shown that Moran Towing had actual knowledge of "obviously improvident judgment" on the part of the Buck Kreihs crew.[71] There is no evidence that Moran Towing, through its crew members, had actual knowledge that the Buck Kreihs crew would not take steps to secure the cover such as using the safety pin which was available and which they were trained to use.

First of all, while using the hatch with the cover unsecured was unwise, it does not necessarily rise to the level of egregious behavior necessary to be considered "improvident."[72] Second, there is no evidence that Moran Towing knew that the Buck Kreihs crew would continue to use the hatch cover in an unsecured state after the cover almost fell on Dixon. Without the requisite proof of actual knowledge, any claims under the active control duty fail as a matter of law and Moran Towing is entitled to summary judgment on that issue.

---

[71] Burchett v. Cargill, Inc., 48 F.3d 173, 178 (5th Cir. 1995)[emphasis supplied].
[72] Washington, 374 F.Supp.3d at 1359. [Even if the maritime employees' choice to use the equipment in an unsafe manner was "unwise," it does not follow that the vessel owner was on notice that the maritime employee's "obviously improvident" use.].

**Summary Judgment**

Summary Judgment under F.R.C.P. 56 is "proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law.[73] If the non-movant, Evans, bears the burden of proof at trial, then to obtain summary judgment, Moran Towing as the movant may merely point out the absence of evidence.[74] Here, Evans has the burden of proof at trial that the acts or omissions of Moran Towing violated one of the Scindia duties. Thus, Moran Towing fulfills its burden on the motion by pointing out that there is no evidence that the hatch was defective, no evidence that the unlatched condition of the hatch was not open and obvious, no evidence that vessel crew members had active control over Buck Kreihs work, and no evidence that Moran Towing was aware that Buck Kreihs employees were using the hatch in an unlatched condition. Rather, Moran Towing has presented affirmative evidence that the hatch was equipped with a safety pin that the Buck Kreihs workers could have used to secure the cover but, for whatever reason, chose not to ensure their safety, or the safety of their co-worker, by employing the pin.

In summary, because Moran Towing did not violate any of the Scindia duties – the only duties it owed to Evans – Moran Towing is entitled to summary judgment.

## CONCLUSION

It is beyond cavil that the LHWCA, the US Supreme Court, and the Fifth Circuit, among other federal courts, have placed the responsibility for the safety of the maritime workers squarely on the workers and their maritime employers. Vessel owners are only liable in three very narrow and delineated circumstances which are not present in this case. Moran Towing did not breach its

---

[73] Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).
[74] Transamerica Ins. Co. v. Avenell, 66 F.3d 715, 718 (5th Cir. 1995).

turnover duty because the hatch cover was not defective and came equipped with a safety pin. Further, the unlatched condition of the cover was open and obvious to the Buck Kreihs crew and they had actual knowledge of it. The active duty control was not applicable and was not breached because the vessel's crew was not present and did not involve itself in the Buck Kreihs crew's work. Moran Towing did not have a duty to intervene because no crew members observed Evans or the other Buck Kreihs crew engaging in "obviously improvident" acts.

WHEREFORE, Defendant Moran Towing Corporation respectfully requests that this Honorable Court GRANT its motion for summary judgment and dismiss with prejudice the claims of Plaintiff Michael Evans.

**Certificate of Service**

I hereby certify that on the 31st day of October, 2024 I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

*/s/ James A. Crouch, Jr.*

Respectfully submitted,

**STAINES, EPPLING & KENNEY**

*/s/ James A. Crouch, Jr.*
**RUFUS C. HARRIS, III** (#6638)
**JAMES A. CROUCH, JR.** (#35729)
**JEFFREY G. LAGARDE** (#31823)
**SHELBY P. SULLIVAN** (#40961)
3500 N. Causeway Blvd. Ste. 820
Metairie, Louisiana 70002
Telephone: (504) 838-0019
Facsimile: (504) 838-0043
Email:   rufus@seklaw.com
            James@seklaw.com
            jeff@seklaw.com
            shelby@seklaw.com
*Counsel for Moran Towing Corporation*